Filed 8/21/18

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>MELISSA HO,<br><br>        Defendant and Appellant. | A150807<br><br>(Alameda County<br>Super. Ct. No. CH57644) |

Defendant Melissa Ho appeals a judgment convicting her of vehicular manslaughter with gross negligence and reckless driving with great bodily injury, and sentencing her to six years eight months in prison. On appeal, she contends the trial court (1) erred in admitting evidence that she had consumed drugs and alcohol the night before the accident and that she was taking prescription medications for her former heroin addiction; (2) erred in admitting photographs of one of the victims after the accident; and (3) made numerous instructional errors. She also contends that her trial counsel rendered ineffective assistance by failing to object to hearsay testimony that friends tried to convince her not to drive the morning of the accident and that the prosecutor committed misconduct by appealing to the passion and prejudice of the jury. We find no error and therefore shall affirm the judgment.

**Factual and Procedural Background**

Defendant was charged by amended information with one count of vehicular manslaughter with gross negligence (Pen. Code,[1] § 192, subd. (c)(1)) and one count of

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts 3, 4, and 5 of the Discussion.

[1] All statutory references are to the Penal Code unless otherwise noted.

1

reckless driving with great bodily injury (Veh. Code, § 23104, subd. (b)). The information also alleged personal infliction of great bodily injury on both counts (§ 969f) and alleged defendant had previously been convicted of driving under the influence of alcohol (Veh. Code, § 23152, subd. (a)).

The following evidence was presented at trial:

On August 15, 2014, defendant attended a party at a friend's house. Defendant arrived at the party after 10:00 p.m. and stayed, awake, until the morning of August 16. There was alcohol, marijuana, cocaine, Xanax, and Adderall available at the party.

In the morning, as defendant was preparing to leave, her friend told her it was a "a bad idea" to drive because "she hadn't slept all night and did drugs and alcohol." He testified that other friends also tried to persuade her not to drive. Defendant left anyway.

At approximately 11:00 a.m., Te Hung Chang was driving northbound on Interstate Highway 880. He was traveling with the flow of traffic, approximately 60 or 65 miles per hour, when he was hit from behind by defendant. Both he and defendant pulled to the side of the road. Defendant approached Chang, showed him her license and insurance, and apologized for rear-ending his car. Chang did not notice anything unusual about defendant's physical movements. She did not slur her words or seem to have any trouble speaking, nor did she appear sleepy.

Following the collision, defendant called her mother and asked her to bring another car because she was late for work and her car was inoperable. Defendant's mother brought her Volvo to defendant, who left in a hurry, saying she had to stop by home to change before work.

About an hour later, around 12:00 p.m., Damien Johnson and William Sampson were with tow truck driver Michael Andrade on the right shoulder of southbound Interstate Highway 880 in Milpitas. Andrade and Johnson were standing at the rear of his BMW and Sampson was standing behind them when defendant in the Volvo crashed into the group, killing Sampson and injuring Andrade.

Johnson recalled "a big boom" or explosion before blacking out. When he awoke, Andrade was unconscious on the ground. The BMW had been pushed to the right side of

2

the tow truck, about 30 or 40 feet from its original position. Sampson was dead, hanging upside down, pinned between the tow truck and defendant's Volvo. Sampson now had "had one leg." The other had been severed. Johnson saw defendant try to help Andrade get up, but Andrade's leg was broken and he screamed. The parties stipulated that Andrade suffered great bodily injury.

When the police arrived at the scene, defendant was squatting down on the grassy embankment with her face in her arms, crying. She was sitting "about five to ten feet" from Sampson's severed leg. When she was placed into the ambulance, "she kept asking [the officer] if she was going to be going to jail for what happened." The officer did not note signs of driving under the influence.

A collision documentation expert described circular breakage on the windshield of defendant's car and what appeared to be curly black human hair lodged within the shattered glass.

Defendant gave police three explanations for the accident. At the hospital, she told police she was driving 65 to 75 miles per hour. She was trying to merge, looked left, and when she again looked ahead, her car was heading straight toward the BMW. She volunteered that she was a recovering heroin addict but had not used heroin since May. She also stated that she was sleepy but had not been drinking. When defendant was interviewed at the highway patrol office on August 22, she said she fell asleep or blacked out before the accident. She said she had consumed beer and marijuana the night before the accident and mentioned that she had been prescribed Trazodone and Gabapentin as part of her recovery from her heroin addiction. In a third interview at her home on October 28, defendant initially said she consumed only beer and marijuana, but after her toxicology screening was revealed, she said she had snorted cocaine at work before the party, consumed Xanax at the party, and took an Adderall the morning of the collision.

When defendant's blood was drawn at 1:35 p.m. the day of the collision, no alcohol was detected. Defendant's urine sample, collected at 5:38 p.m. on August 16, tested positive for amphetamine, benzodiazepine, cocaine, opiates, and Tetrahydrocannabinol (THC). Dr. Paul Herrmann, an expert in forensic pathology,

3

testified that Trazodone and Xanax would appear as benzodiazepine in a specimen sample and Gabapentin would appear as Gabapentin. THC is the active substance in marijuana and usually appears as a breakdown substance. Adderall appears in a specimen as amphetamine. Herrmann explained that a urine test does not indicate whether a person is under the influence at a given time because substances detected may have already disappeared from the blood. By contrast, a blood test shows what substances are circulating through the brain at that time. He could not determine from the urine sample whether defendant was driving under the influence of the drugs at the time of the accident. Nor could he opine based on the sample that she was not under the influence of a particular drug.

Herrmann also discussed the effect of the various substances defendant ingested before the fatal collision. Trazodone, Gabapentin, and alcohol are central nervous system depressants. Combining alcohol and Trazodone creates an additive effect, resulting in lethargy and drowsiness. Combining Trazodone, Gabapentin, and alcohol would be a "very bad idea" if one was going to drive. Marijuana can have a calming or drowsy effect. A person who ingests Trazodone, Gabapentin, alcohol, marijuana, and Xanax would be on five depressants, which could be a problem for driving. Cocaine and Adderall are central nervous system stimulants. One should not drink alcohol while taking Adderall if one is going to do something dangerous or requiring skill.

Dr. John Fullerton testified as an expert for the defense. He opined there was no evidence connecting defendant's drug use to impairment. He noted that defendant said the last thing she remembered was either blacking out or falling asleep as she went off the road, and there was nothing in her interaction with the police officer at the scene suggesting she was intoxicated or impaired by substances from the night before. He noted that defendant had reported a possible seizure in 2012 and that it was possible that was what she "very well may have had experienced here." Fullerton said there was "a distinct possibility" that she had a seizure on August 16, and may have had two—one at the time of each collision—because "they come in clusters." Although he acknowledged the combination of staying up all night and consuming Xanax, marijuana, alcohol, cocaine,

4

Gabepentin, Trazodone, and Adderall "may have had an effect," he did not think this combination was as plausible a reason as a seizure for "the loss of consciousness I thought was there."

The jury found defendant guilty as charged. Defendant was sentenced to prison for six years eight months. Defendant timely filed a notice of appeal.

**Discussion**

1. *Evidence of defendant's drug use was properly admitted*.

Defendant contends the court erred in admitting the evidence that she had consumed drugs and alcohol the night before the accident and that she had been prescribed Gabapentin and Trazodone for her former heroin addiction. She argues the evidence is irrelevant because there was no scientific showing that any of these substances were affecting her at the time of the fatal collision, and that any inference that she was under the influence of drugs at the time of collision was speculative. She also argues that this evidence was unduly prejudicial under Evidence Code section 352.

The trial court found that the evidence of defendant's drug use and "the side effects and consequences of these drugs" appeared to be "extremely relevant based on the context of this case." The court emphasized that the relevant question was not whether defendant was under the influence at the time of the accident "because we're not doing this as a DUI manslaughter, it's a gross negligence manslaughter—as to whether or not someone may have been impacted in such a way that they are acting with gross negligence when they are driving a motor vehicle." The court noted that even if the experts testified there was no evidence of cocaine being in her system at the time of the collision, "that testimony does not eliminate the possibility that there's a valid argument because the defendant had not slept, . . . because, whatever the facts prove or demonstrate" there is an alternate theory for gross negligence. With respect to prejudice the court stated, "I have considered, of course, the [Evidence Code section] 352 analysis required. I do understand the potential prejudice associated with heroin reference as well as the reference to the drug use the night before. However, in view of the totality of the

circumstances as well as the charges alleged, I believe there is a substantial probative value that substantially outweighs any potential prejudice particularly when any potential prejudice from the court's perspective can be mitigated by [defense counsel's] questioning concerning the very specific natures and durations of the drugs and narcotics used." We review the trial court's determination regarding the relevance of evidence and whether its prejudicial effect outweighs its probative value for an abuse of discretion. (*People v. Horning* (2004) 34 Cal.4th 871, 900.)

Initially, we agree with the trial court that, contrary to defendant's argument, the relevant question is not whether defendant was impaired at the time of the accident, but whether she was acting with gross negligence. Defendant was charged with vehicular manslaughter with gross negligence under section 192, subdivision (c)(1), which is defined in relevant part as "driving a vehicle in the commission of a lawful act which might produce death, in an unlawful manner, and with gross negligence." In contrast, section 191.5 defines the separate offense of "[g]ross vehicular manslaughter while intoxicated," which is "the unlawful killing of a human being without malice aforethought, in the driving of the vehicle, where the driving was in violation of [Vehicle Code] section 23140, 23152, or 23153, and the killing was either the proximate result of the commission of an unlawful act, not amounting to a felony, and with gross negligence, or the proximate result of the commission of a lawful act that might produce death, in an unlawful manner, and with gross negligence." (§ 191.5, subd. (a).) As the Attorney General notes, "although both offenses require the prosecution to prove gross negligence, only section 191.5, subdivision (a) requires proof of intoxication or impairment. This is why vehicular manslaughter with gross negligence in violation of section 192, subdivision (c)(1), is a lesser included offense of gross vehicular manslaughter while intoxicated. (See *People v. Miranda* (1994) 21 Cal.App.4th 1464, 1468.)" Accordingly, the prosecution was not required to establish defendant's impairment at the time of the

accident and the evidence was not admitted for this purpose.[2]

As the trial court explained, the evidence was relevant to prove defendant acted with gross negligence. As the court subsequently instructed, gross negligence requires proof that: (1) a defendant "acts in a reckless way that creates a high risk of death or great bodily injury"; and (2) "a reasonable person would have known that acting in that way would create such a risk." (CALCRIM No. 592.) "A person acts with gross negligence when the way he or she acts is so different from how an ordinary careful person would act in the same situation that his or her act amounts to a disregard for human life or indifference to the consequences of that act." (*Ibid*.) "[G]ross negligence may be shown from *all* the relevant circumstances, including the manner in which the defendant operated his vehicle, the level of his intoxication, and any other relevant aspects of his conduct." (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1207.) As the prosecutor argued in closing, defendant's drug use was but one factor tending to prove defendant's gross negligence: "She had already been in an accident at 11 a.m., and now she doesn't take herself off the road? She's been up all night partying. She's on all kinds of medications. She's partying. She hasn't slept. She's speeding because she's late for work. She tells her mom, 'I'm already late for work.' And you have her going 65 to 75 miles an hour when she takes this young man and pins him against the flatbed."

The court did not err in "fail[ing] to separately analyze the proffered [drug] evidence for probativeness resulting in the admission of extensive irrelevant prejudicial evidence," as defendant argues. As the court explained, "what we have here is a continuous course of conduct. And I have wrangled with the possibility of parsing out

---

[2] To the extent that most of defendant's arguments rely on this faulty premise, they are rejected. Likewise, for this reason, defendant's reliance on *David v. Hernandez* (2017) 13 Cal.App.5th 692, 699, is misplaced. In that case, the court upheld the trial court's exclusion of proffered expert testimony that plaintiff was under the influence of marijuana based on THC found in his urine sample. The court agreed with the trial court that such a conclusion would be speculative. (*Ibid*.) Here, however, the prosecution's expert did not opine that defendant was under the influence at the time of the accident. To the contrary, the expert testified that he could not draw any conclusion regarding defendant's sobriety based on the urine test results.

certain drugs, certain statements, certain effects, and under the circumstances I don't believe parsing is possible, nor do I think it's fair to either case." There was no error in the court's approach.

Finally, the court did not abuse its discretion is concluding that the probative value of this evidence outweighed its potential prejudice under Evidence Code section 352. " 'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying [Evidence Code] section 352, "prejudicial" is not synonymous with "damaging." ' " (*People v. Karis* (1988) 46 Cal.3d 612, 638.) The evidence of defendant's drug use in the hours preceding the accident is directly connected to the offenses committed in this case and was not unduly prejudicial. Evidence that defendant had previously used heroin was relevant to explain the prescription medications she was taking. Any potential prejudice from the testimony that she had previously used heroin was largely mitigated by the evidence that no heroin was detected in her system after the accident.

In short, there was no error in the admission of the evidence.

2. *The jury was properly instructed on gross negligence and reckless driving*.

Defendant identifies three purported instructional errors: (1) the trial court improperly modified CALCRIM No. 592 so as to omit a required element; (2) the trial court failed to instruct on the necessary elements of various vehicle code sections relating to speeding and driving under the influence and failed to include a unanimity instruction; and (3) the court erred by omitting the optional language regarding evidence of speeding from CALCRIM No. 2200. We find no error.

The jury was instructed pursuant to CALCRIM No. 592 in relevant part as follows: "The defendant is charged in count one with felony vehicular manslaughter with gross negligence in violation of Penal Code section 192(c)(1). [¶] To prove that the defendant is guilty of felony vehicular manslaughter with gross negligence, the People must prove that: [¶] 1. The defendant drove a vehicle; [¶] 2. While driving that vehicle,

8

the defendant committed an otherwise lawful act that might cause death; [¶] 3. The defendant committed the otherwise lawful act that might cause death with gross negligence; [¶] AND [¶] 4. The defendant's grossly negligent conduct caused the death of another person. [¶] . . . [¶] The People allege that the defendant committed the following otherwise lawful act that might cause death: operating or driving a motor vehicle."

Defendant contends that a violation of section 192, subdivision (c)(1) requires proof of a predicate "otherwise lawful act" other than driving that is performed with gross negligence. The above instruction, she argues, improperly identified operating or driving a motor vehicle as the predicate lawful act. Defendant cites *People v. Nicolas* (2017) 8 Cal.App.5th 1165 (*Nicolas*) as an example of a correct instruction. In that case, the jury was given the same version of CALCRIM No. 592 as that given in this case, but advised that the People " 'allege that the defendant committed the following otherwise lawful acts that might cause death: Driving with Inattention.' " (*Id*. at p. 1173.) The issue in *Nicolas*, however, was not whether the court properly instructed the jury regarding the predicate lawful act, but whether the court properly instructed the jury on the requisite mental state. The court explained that the crime "entails the confluence of two different mental states: general intent in the driving of the vehicle, and . . . gross negligence in the commission of a lawful act not amounting to a traffic violation (in this case 'Driving with Inattention')." (*Ibid.*) *Nicolas* is not authority for the proposition that the prosecution must allege a lawful act other than driving to establish vehicular manslaughter with gross negligence. At best, *Nicolas* suggests that additional detail regarding defendant's driving might have been added to the instruction, but such amplification is not required and defendant did not make any such request.

*People v. Minor* (1994) 28 Cal.App.4th 431 (*Minor*), cited by defendant, is also distinguishable. In that case, the court held that where the prosecution alleges a violation of Vehicle Code section 23153 (driving under the influence of alcohol or drugs causing injury) based on the commission of an unlawful predicate act, the jury must be instructed

9

on the elements of the alleged unlawful act.[3] (*Id*. at p. 438.) The court expressly observed that the prosecution case was based on defendant's violation of specific Vehicle Code sections, "not on a negligence theory." In so stating, the court implicitly recognized that a conviction could be based on evidence of a "neglect of duty *in addition* to driving under the influence." (*Ibid*.) Nothing in *Minor* suggests that driving in a grossly negligent manner would not satisfy that element.

This case was prosecuted solely on the theory that defendant's grossly negligent operation of a motor vehicle caused the accident. Although the prosecutor made reference to defendant's speed and drug use, the prosecutor did not argue that defendant was guilty based on her violation of any specific Vehicle Code section. Accordingly, the trial court was not required to instruct, as defendant contends, on the elements of any predicate Vehicle Code offenses.

For the same reason, no unanimity instruction was required. The prosecutor argued that defendant's conduct of ingesting drugs and alcohol, staying awake all night, and continuing to drive at freeway speed after already causing one accident combined to constitute gross negligence. As the Attorney General argues, "The jury would not have had a rational reason to identify one of those as the basis of gross negligence and not the other, especially where the prosecutor argued it was the collective circumstances that constituted gross negligence." While defendant raises this issue in her appellate briefing, in the trial court defense counsel expressly and correctly acknowledged that a unanimity instruction was not required under the prosecutor's theory.

Finally, there was no error with CALCRIM No. 2200 as given in this case. The court instructed the jury regarding reckless driving as follows, "The defendant is charged in count two with felony reckless driving with great bodily in violation Vehicle Code

---

[3] The jury in *Minor* was instructed that "the elements of section 23153, subdivision (a), are as follows: (1) driving a vehicle while under the influence of an alcoholic beverage or drug; (2) when so driving, committing some act which violates the law or is a failure to perform some duty required by law; and (3) as a proximate result of such violation of law or failure to perform a duty, another person was injured." (*Minor, supra,* 28 Cal.App.4th at pp. 437-438.)

section 23104(b). [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1.The defendant drove a vehicle on a highway; [¶] 2.The defendant intentionally drove with wanton disregard for the safety of persons or property; [¶] AND [¶] 3. In doing so, the defendant proximately caused great bodily injury to a person other than himself or herself. [¶] A person acts with *wanton disregard for safety* when (1) he or she is aware that his or her actions present a substantial and unjustifiable risk of harm, and (2) he or she intentionally ignores that risk. The person does not, however, have to intend to cause damage or great bodily injury."

Defendant contends the court erred in omitting from the instruction optional language that she requested: "If you conclude that the defendant drove faster than the legal speed limit that fact by Itself does not establish that the defendant drove with wanton disregard for safety. You may consider the defendant's speed, along with all the surrounding circumstances, in deciding whether the defendant drove with wanton disregard for safety." The Attorney General argues that defendant forfeited this objection by failing to object in the trial court. It appears that defendant did fail to object in the trial court. More importantly, the omission, if error, certainly was not prejudicial. There is no reasonable likelihood that the jury based its finding that defendant drove with wanton disregard for safety based solely on the evidence that she was driving 65 to 75 mph. As the Attorney General observes, "The prosecutor never alleged that [defendant] was speeding in violation of the posted speed limit, i.e., never alleged [defendant] committed an unlawful act or infraction. In fact, prosecution evidence estimated that [defendant] was driving 65 to 75 mph. The prosecutor discussed the speed at which [defendant] was driving not as an infraction or as unlawful, but as part of the total circumstances that rendered [defendant's] conduct as a whole grossly negligent." There was no instructional error.

11

3. *Trial counsel was not ineffective in failing to object to hearsay testimony that two people other than the witness tried to dissuade defendant from driving.*[*]

To obtain reversal of a conviction based on ineffective assistance of counsel, a defendant must show (1) "that defense counsel's performance fell below an objective standard of reasonableness, i.e., that counsel's performance did not meet the standard to be expected of a reasonably competent attorney, and (2) that there is a reasonable probability that defendant would have obtained a more favorable result absent counsel's shortcomings." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003, citing *Strickland v. Washington* (1984) 466 U.S. 668, 687-694.) A reasonable probability is one that undermines confidence in the outcome. (*Cunningham*, p. 1003.)

Defendant contends her counsel provided ineffective assistance in failing to object to her friend's testimony that two people at the party other than himself tried to talk her out of driving. She acknowledges that the testimony was likely admissible for the limited non-hearsay purpose of showing the effect of the statements on defendant. She argues that the failure to object was prejudicial because she was entitled to a limiting instruction that the hearsay was not to be considered for the truth of the fact that she should not have been driving. Assuming that the failure to object was deficient, there is no reasonable probability that defendant would have obtained a more favorable result had such a limiting instruction been given. In light of the properly admitted testimony of defendant's friend who hosted the party that he tried to convince defendant not to drive, the limitation on the consideration of the testimony that two others also did so would have done little to diminish the significance of defendant having been warned she should not drive. Given the considerable other evidence of defendant's reckless conduct that morning, the absence of the limiting instruction cannot reasonably be thought to have affected the outcome of trial.

---

[*] Part 3 is not certified for publication. (See fn., *ante*, p. 1.)

4. *Photographs of Sampson's injuries were properly admitted.*[*]

Defendant contends the admission of four photographs, described by defendant as the "head shot" (exhibit F), the "bloody missing clump of hair" (exhibit G), the "toe tag" (exhibit H) and the severed leg (exhibit 2-25), was "so fundamentally unfair that it deprived [defendant] of her due process right to a fair trial." Prior to trial, defendant objected to the admission of the photographs under Evidence Code section 352 as irrelevant, in part because she had agreed to stipulate to the element of great bodily injury. The court found the first three photographs probative on the issue of causation and concluded that "any prejudice associated with these photographs to be inherently associated with the prejudice of this type of offense." The court observed that the photograph of the severed leg was "very tame" when viewed in comparison to other photographs not being introduced. The court explained, "considering the totality of the circumstances and weighing the substantial probative value, in view of the contested positions of both counsel as to the matter relating to both causation as well as the defendant's state of mind and her conduct at the time of the accident, any associated prejudice is substantially outweighed from that probative value."

"[T]he court's decision to admit victim photographs is a discretionary matter that we will not disturb on appeal unless the prejudicial effect of the photographs clearly outweighs their probative value." (*People v. Martinez* (2003) 31 Cal.4th 673, 692) While photographs of victims may be "disturbing" and "unpleasant to view," they are admissible if "they are not unduly gruesome or inflammatory" and bear "some relevance to issues in the case." (*Id*. at pp. 692-693.)

Here, exhibit F and exhibit H are not particularly gruesome. Sampson's face had been washed in exhibit F and exhibit H is merely a toe tag. The photographs were admissible to establish the identity of the victim. As the prosecutor argued, exhibit G was important because it showed a clump of hair was missing from the back of Sampson's head, which supported the prosecution's theory that the hair found on defendant's

---

[*] Part 4 is not certified for publication. (See fn., *ante*, p. 1.)

13

windshield belonged to Sampson. This evidence was relevant because defendant disputed that the "black stuff" found on the windshield was Sampson's hair. Finally, the photo of the severed leg was relevant to defendant's state of mind. Testimony was received that immediately following the accident, defendant sat down next to the severed leg, but her first question to the responding officers was, "Am I going to jail for this?" Accordingly, there was no abuse of discretion in admitting this photographic evidence.

5. *The prosecutor did not commit misconduct by referencing Sampson's severed leg.*[*]

Defendant contends that the prosecutor's repeated references to the victim's severed leg was an improper appeal to prejudice, passion and emotion. Defendant did not object to any of the prosecutor's allegedly improper comments in the trial court and has made, at best, a half-hearted effort at briefing this issue on appeal. Accordingly, she has forfeited this argument. (*People v. Thornton* (2007) 41 Cal.4th 391, 454 ["A defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion, and on the same ground, the defendant objected to the action and also requested that the jury be admonished to disregard the perceived impropriety."]; *People v. Sperling* (2017) 12 Cal.App.5th 1094, 1104 [A " 'bare, unsubstantiated [and conclusory] assertion does not . . . satisfy appellant's burden on appeal.' "].)

In any event, having reviewed the record ourselves, we find no misconduct. " 'A prosecutor commits misconduct when his or her conduct either infects the trial with such unfairness as to render the subsequent conviction a denial of due process, or involves deceptive or reprehensible methods employed to persuade the trier of fact.' [Citation.] A defendant asserting prosecutorial misconduct must further establish a reasonable likelihood the jury construed the remarks in an objectionable fashion." (*People v. Duff* (2014) 58 Cal.4th 527, 568.) To the extent the prosecutor referenced the severed leg, the comments were directly related to defendant's conduct immediately following the accident. The arguments were passionate but not improper. (*People v. Escarcega* (1969)

_____

[*] Part 5 is not certified for publication. (See fn., *ante*, p. 1.)

273 Cal.App.2d 853, 862-863 ["The prosecution may properly urge his points vigorously as long as he does not act unfairly."].)

## Disposition

The judgment is affirmed.

Pollak, J.

We concur:

Siggins, P.J.
Jenkins, J.

A150807

| | |
|---|---|
| Trial court: | Alameda County Superior Court |
| Trial judge: | Hon. Tara M. Seautels |
| Counsel for appellant: | Carmela Caramagno |
| Counsel for respondent: | Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Jeffrey M. Laurence Senior Assistant Attorney General, Rene A. Chacon, Supervising Deputy Attorney General, Linda M. Murphy, Deputy Attorney General |

A150807