Filed 5/25/21  P. v. Lewis CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> KISLE LEWIS, <br><br> Defendant and Appellant. | B304675 <br><br> (Los Angeles County Super. Ct. No. BA471314) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Stephen A. Marcus, Judge.  Affirmed.

Larenda R. Delaini, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle and Chung L. Mar, Deputy Attorneys General, for Plaintiff and Respondent.

Kisle Lewis was charged with assault with a firearm, discharging a firearm from a vehicle, and attempted murder. In the first trial, Lewis claimed self-defense. At the second trial, following a mistrial, Lewis abandoned his assertion that he acted in self-defense. Instead, Lewis denied using any force or having any subjective fear at the time of shooting. He insisted that someone outside of his vehicle shot the victim. Nonetheless, on appeal, Lewis contends the trial court committed prejudicial error by failing to instruct the jury on self-defense. We disagree and affirm the judgment.

## BACKGROUND

I.    The shooting

On August 26, 2018, Tiffany Lagunas was driving her husband, Eduardo Leon, and her two children home from a party when they stopped at a convenience store to buy cigarettes. Lagunas remained in the car while Leon went inside the store. Leon felt tipsy because he drank approximately eight beers over a three and one-half hour period.

As they were driving away, they saw an altercation between Lewis and another man outside the convenience store. The man appeared homeless and had a bicycle. Lagunas heard the man scream at Lewis and saw him throw his bicycle at Lewis. Lagunas thought the man was attacking Lewis. Leon saw the man punch Lewis, but thought that Lewis was the aggressor and that the man was getting beat up. Leon said to Lagunas, "That wasn't right. I'm going to go help the guy." Lagunas told Leon not to get out of the car, but he got out anyway.

As Leon approached them, the man picked up his bicycle and walked away while Lewis got into his car and sat in the

2

driver's seat.  Leon stood next to Lewis's driver-side door and asked the man with the bicycle if he was okay.  Leon did not say anything to Lewis.  When Leon looked into Lewis's car, he saw Lewis reach for something in the passenger area that Leon assumed was a weapon.  Leon pushed on the driver-side door to prevent Lewis from getting out while Lewis tried to push the door open.  After a few seconds, Lewis shot Leon in the shoulder with a handgun through the driver-side window, shattering the glass.  During this encounter, Leon did not see anyone other than Lewis in the car.

Lagunas rushed Leon to the hospital where he underwent surgery to remove the bullet from his body.

Lewis testified in his defense.  On the night of the incident, he was on his way to pick up his girlfriend when he encountered his friend "Rabbit," who asked for a ride.  Lewis knew Rabbit through Lewis's methamphetamine dealer.  He did not know if Rabbit was armed with any weapons.  They stopped at the convenience store so Lewis could get change for a $20 bill.  While Lewis got change, Rabbit remained in the backseat of the car.  Lewis saw Leon in the store, but they did not interact.

When Lewis returned to his car, the man with the bicycle threw it at Lewis and said, "Where's my shit at?"  The man then reached into his pocket, showed Lewis the butt of a gun, and told Lewis, "I don't care about going to jail, I'll kill you nigga out here."

Lagunas and Leon then pulled up next to the man, and Leon shouted from the car, "fuck mayates," which Lewis understood as a racial slur referring to Black people.  Lewis got into his car and started the ignition.  As he put his car into gear, Leon banged on the driver-side window with an unknown hard

3

object.  Startled, Lewis accidentally put his car in reverse.  He wanted to get away from the area to avoid an attack by Leon and the other man.  He was frightened for his life.  He then heard a gunshot from outside his car and drove away.  He did not see Leon get shot.  His window did not shatter, and he did not see Rabbit fire the gun.  The only person that Lewis saw with a gun that night was the man with the bike.  Lewis denied having a weapon, shooting Leon or acting in self-defense.

After the shooting, Lewis dropped off Rabbit nearby and went to a friend's house to discuss the incident.[1]

## II.    Procedure

A jury found Lewis guilty of assault with a semiautomatic firearm (Pen. Code,[2] § 245, subd. (b); count 1) and discharging a firearm from a vehicle (§ 26100, subd. (c); count 2).  The jury found Lewis not guilty of attempted murder (§§ 664/187, subd. (a); count 3).  The jury also found the firearm enhancement allegations true (§§ 12022.5 [count 1], 12022.53, subds. (b) & (d) [count 2]).

The trial court found that Lewis suffered one qualifying prior conviction under the "Three Strikes" law (§§ 667, subds. (b)–(j), 1170.12, subd. (b)), and one prior serious felony conviction (§ 667, subd. (a)(1)).

---

[1] Neither Rabbit nor the friend testified at trial.

[2] All further statutory references are to the Penal Code.

On January 17, 2020, the trial court denied probation and sentenced Lewis to an aggregate determinate term of 25 years in state prison.[3]  Lewis appealed.

## DISCUSSION

Lewis contends the trial court committed prejudicial error by denying his request for a self-defense instruction despite Lewis's testimony that he did not shoot Leon and that the gunshot came from outside his car.  His testimony notwithstanding, Lewis asserts that there was substantial evidence for the jury to infer that he feared for his life and that he shot Leon in self-defense.  We disagree.

"A trial court must instruct the jury sua sponte on general principles of law applicable to the case.  [Citation.]  This requirement includes instruction on lesser included offenses supported by the evidence.  [Citation.]  A trial court is required to instruct sua sponte on any defense, including self-defense, only when there is substantial evidence supporting the defense, and the defendant is either relying on the defense or the defense is not inconsistent with the defendant's theory of the case. [Citation.]  If the defense is supported by the evidence but is inconsistent with the defendant's theory of the case, the trial court should instruct on the defense only if the defendant wishes the court to do so." (*People v. Villanueva* (2008) 169 Cal.App.4th 41, 49.)

_____

[3] The court elected to impose a 10-year enhancement pursuant to section 12022.53, subdivision (b) and not the 25-year-to-life enhancement pursuant to section 12022.53, subdivision (d).

However, even if the defendant requests an instruction on a defense, the trial court need not give that instruction if it is unsupported by substantial evidence. (*People v. Villanueva*, *supra*, 169 Cal.App.4th at p. 49.) Substantial evidence is that which is reasonable, credible, and of solid value. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) In determining whether substantial evidence supports a defense, the trial court must not weigh witness credibility. (*People v. Elize* (1999) 71 Cal.App.4th 605, 611–612.) We review claims of instructional error de novo. (*People v. Rivera* (2019) 7 Cal.5th 306, 326.) In doing so, we are required to review the evidentiary support for giving an instruction " 'in the light most favorable to the defendant' [citation] and . . . resolve doubts as to the sufficiency of the evidence to warrant instructions ' "in favor of the accused." ' " (*People v. Wright* (2015) 242 Cal.App.4th 1461, 1483.)

A defendant acts in lawful self-defense if the defendant (1) reasonably believes he or she is in imminent danger of suffering bodily injury, (2) reasonably believes the immediate use of force is necessary to defend against that danger, and (3) uses no more force than is reasonably necessary. (*People v. Hernandez* (2011) 51 Cal.4th 733, 747.) The defendant must actually and reasonably believe in the need to defend against imminent peril to life or great bodily injury. (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082.)

In the present case, Lewis expressly denied believing that the immediate use of force was necessary. Moreover, he repeatedly disavowed using any force, reasonable or otherwise, or acting in self-defense. Over and over again, Lewis claimed that he did not fire a gun or shoot Leon. Instead, he maintained that he was safely in his car when he heard a gunshot that originated

6

from outside of his vehicle.  Although Lewis testified that he feared for his life when the man displayed the butt of a gun when he was outside of his car, he also insisted that he had no "reason to harm anybody" because he was able to get away from the man and safely retreat to his car.  During cross-examination, the prosecutor asked Lewis:

"[Prosecutor]:  Mr. Lewis, isn't it true that you did shoot Mr. Leon that night because it was really scary what he did?

"[Lewis]:  No sir.  I didn't have any reason to harm anybody.

"[Prosecutor]:  Well, you had just been approached by a guy on a bike who you have never met before, right, and he showed you a gun and threatened to kill you?

"[Lewis]:  And I ran.

"[Prosecutor]:  Well, you tried to run.  You tried to get into your car?

"[Lewis]:  I got into my car, I turned my car on, I was leaving."

Lewis's testimony that he had no reason to harm anyone because he was able to walk away from the man with the bike and shelter in his car, undermines any suggestion that Lewis actually believed that the immediate use of force was necessary at the moment the gun was discharged.  Therefore, there was no substantial evidence that Lewis actually believed the need to defend against imminent peril or that he used no more force than was reasonably necessary.

Although Lewis testified that he was not the shooter and he had no need to use force, he nevertheless argues that there was substantial evidence to support a self-defense instruction.  He claims that the jury could have constructed an alternate factual

7

scenario where Lewis believed it necessary to shoot Leon to prevent imminent harm. He cites *People v. Villanueva, supra,* 169 Cal.App.4th 41 to support his position that he was entitled to a self-defense instruction. There, the evidence showed that the defendant and another man fought, and the man threatened to kill him the next time they met. (*Id.* at p. 46.) They encountered each other again when the man was parked in his van. The defendant acknowledged that he pointed a handgun at the man and ordered him to leave the area as he walked towards the man. The man responded, " 'I was born to die,' " and drove the van forward. (*Id.* at p. 47.) The defendant claimed that he moved out of the way and his gun fired accidentally. (*Ibid.*) The trial court refused to instruct on self-defense, and the jury convicted the defendant of attempted murder. (*Id.* at p. 48.) The appellate court observed that "a defendant's assertion of accident *may be* disregarded by the jury in an appropriate case, and will not foreclose jury instruction on self-defense when there exists substantial evidence that the shooting was intentional (and met the other requirements of self-defense)." (*Id.* at p. 51.)

Lewis also relies on *People v. Elize, supra,* 71 Cal.App.4th 605. In that case, two women, who were in a romantic relationship with the defendant, went to his workplace where he was an armed guard. (*Id.* at pp. 606–607.) It was undisputed that the defendant and two women fought, the defendant suffered a broken wrist from being struck by an object, and that the defendant fired his gun. (*Id.* at p. 609.) The defendant testified that both women struck him repeatedly with iron pipes, which the women denied. (*Ibid.*) He claimed that there was a struggle over his gun with one of the women and that he fired it accidentally. (*Ibid.*) The trial court refused to instruct on self-

8

defense because the defendant testified that he fired the gun accidentally. (*Id.* at p. 610.) The appellate court reversed, finding "a jury could find from the evidence presented that defendant was sought out and attacked by two angry women much larger than he, that he was being beaten with pipes, that this beating accounted for his broken wrist, that one of the women tried to take his handgun, and that he struggled with that woman while the other continued to beat him. A jury could disbelieve defendant's testimony that the gun fired accidentally during this struggle. A jury could find that defendant fired the gun intentionally, hoping to end the attack upon him either by hitting one of his assailants or by firing into the air to scare off his attackers." (*Id.* at pp. 615–616.)

The trial court considered, compared, and ultimately, distinguished the facts of *Villanueva* and *Elize* to the facts here. "[T]he difference that I see, is that . . . [t]he[y] said [t]he[y] shot the person. [They] said . . . it's an accident . . . . [¶] Your guy is claiming he had nothing to do with any kind of shooting. He didn't shoot anybody." The trial court also discussed other problematic aspects of Lewis's testimony that were inconsistent with self-defense. "[E]ven if we took the facts in the most favorable fashion to the defendant, and I have thought about that, that someone came running up to his car, and even—he himself testified today that he didn't think he had a knife. He just knows it was something cracking on the car. I know in the other trial he said it was a knife, but he didn't exactly say it was a knife in this; it was a tapping or a metal thing [¶] . . . [¶] . . . [a] banging on his car, or some kind of noise. But even if we accepted his statement, I do not believe that that is sufficient evidence to permit him to shoot somebody with a gun. And he's

9

inside the car.  I don't think that rises . . . to a self-defense situation."

The trial court's assessment that *Elize* and *Villanueva* are distinguishable was correct.  In each case, it was undisputed that the defendants shot the firearm, but each defendant claimed that the shootings were accidental.  Each involved a factual scenario where there was substantial evidence in support of self-defense, irrespective of the defendant's testimony.  Thus, the jury could reject the defendants' testimony that they fired their weapons accidentally, but still find that they intentionally fired the guns in lawful self-defense.  However, here, Lewis denied that he engaged in the underlying conduct altogether, i.e., he did not have a gun and did not shoot Leon accidentally or intentionally.  Moreover, Lewis denied believing he needed to defend against imminent peril to life or great bodily injury.  The jury would have to construct a new defense based on a scenario that was not presented to them that Lewis believed he had to shoot Leon because he actually and reasonably believed in the need to defend against imminent peril to life or great bodily injury.  Here, as we discussed, there was no substantial evidence of this scenario and the jury would have had to rely on speculation to reach such a conclusion  Accordingly, the trial court correctly denied Lewis's request to instruct the jury on self-defense.

**DISPOSITION**

The judgment is affirmed.
NOT TO BE PUBLISHED.


KALRA, J.*

We concur:


LAVIN, Acting P. J.


EGERTON, J.

---

**\*** Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.